**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **ROBYN RENEE ESSEX, *et al.*,**<br><br>**Plaintiff and Intervenor-Plaintiffs,**<br><br>**v.**<br><br>**KRIS W. KOBACH, in his official capacity as Kansas Secretary of State, *et al.*,**<br><br>**Defendant and Intervenor-Defendant.** | ) | **CIVIL ACTION**<br>**Case No.: 5:12-cv-04046-KHV-JWL** |

**MEMORANDUM IN SUPPORT OF CONGRESSIONAL AND STATE REDISTRICTING PLANS PROPOSED BY INTERVENOR-PLAINTIFFS SENATOR OWENS, HENDERSON, SHANER, AND WIMMER**

**John C. Frieden #06592**
**Kevin M. Fowler #11227**
**Clinton E. Patty #18912**
**Eric I. Unrein #16042**
**FRIEDEN, UNREIN & FORBES, LLP**
**555 S. Kansas Avenue, Suite 303**
**P.O. Box 639**
**Topeka, Kansas 66603**
**785-354-1100 Phone**
**785-354-1113 Fax**
**jfrieden@fuflaw.com**
**kfowler@fuflaw.com**
**cpatty@fuflaw.com**
**eunrein@fuflaw.com**

**Pedro L. Irigonegaray #08079**
**Irigonegaray & Associates**
**1535 SW 29th Street**
**Topeka, Kansas 66611-1901**
**785-267-6115 Phone**
**785-267-9548 Fax**
**pli@plilaw.com**

**ATTORNEYS FOR INTERVENOR-PLAINTIFFS SENATOR THOMAS C. OWENS, JOHN E. HENDERSON, BERNIE SHANER, AND RON WIMMER**

# TABLE OF CONTENTS


**SUMMARY OF ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . 2

- **A.** **The Population Shift Reflected in the 2010 Census** . . . . . . . . 3
- **B.** **The Redistricting Process** . . . . . . . . . . . . . . . . . . 5
  - **1.** **The Legislature's Preparation for Redistricting** . . . . . . . . 5
  - **2.** **Redistricting Criteria** . . . . . . . . . . . . . . . . . . 6
  - **3.** **Legislative Activity Leading Up to the Senate's Adoption of Sunflower 9C and the Senate Committee's Passing of Sunflower 13** . . . . . . . . 8
  - **4.** **Legislative Activity Leading Up to the Senate's Adoption of Buffalo 30 Revised** . . . . . . . . 8
  - **5.** **Legislative Activity Leading Up to the Senate's Adoption of Cottonwood I** . . . . . . . . 8
  - **6.** **Legislative Activity Leading Up to the Senate's Adoption of Buffalo 30 Revised SBOE** . . . . . . . . 9
  - **7.** **The House of Representative's Refusal to Adopt the Kansas Senate's Plan for Senatorial Redistricting Broke a Long-standing Tradition of the Kansas Legislature** . . . . . . . . 9

**ARGUMENT**

- **A.** **United States Supreme Court Precedent and Federal Standards Guide the Court's Implementation of Remedial Reapportionment and Redistricting Plans for the State of Kansas** . . . . . . . . 10
- **B.** **The Court Should Adopt Sunflower 9C or Sunflower 13 as the Congressional Plan** . . . . . . . . 12
  - **1.** **Both Sunflower 9C and Sunflower 13 are within the allowable constitutional deviations** . . . . . . . . 13

2. **Although the Owens Intervenors prefer Sunflower 9C because the Senate passed it by a constitutional majority, they do not object to Sunflower 13, which was on the Senate's calendar at the time of adjournment** . . . . . . . . . . . **13**

C. **The Court Should Adopt Buffalo 30 Revised as the Kansas State Senate Plan** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

1. **Buffalo 30 Revised is within the allowable constitutional deviations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

2. **Buffalo 30 Revised is the only plan presented to the Court that passed the Senate with a constitutional majority of 21 votes, it is the only plan before the Court to receive bipartisan support in the Senate, and it is the only plan that reflects the will of the Senate to collapse a senate district to accommodate the continued growth in Johnson County** . . . . . . . . . . . . . . . . **16**

3. **Buffalo 30 Revised accommodates the continued growth of Johnson County by adding another senate district** . . . . . . **18**

4. **Collapsing a senate district in South Central Kansas produces the fairest result of any of the plans before the Court** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

5. **When viewed in terms of "traditional redistricting principles," Buffalo 30 Revised serves basic notions of fundamental fairness** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

a. **Buffalo 30 Revised contains compact and contiguous districts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

b. **Buffalo 30 Revised attempts to preserve communities of interest** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

c. **Buffalo 30 Revised respects political subdivisions. It splits subdivisions only where necessary to achieve constitutional deviations or serve another "traditional redistricting principle"** . . . . . . . . . . . . . . . . . . . . . . . . . **27**

(1) **Counties** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

(2) **Cities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

(3) **Precincts (or voting districts "VTDs")** . . . . . . . **28**

(4) **Buffalo 30 Revised's treatment of political subdivisions compares favorably with the 2002 plan** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

d. **Buffalo 30 Revised places only two incumbents in the same district** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

6. **Buffalo 30 Revised does not have the purpose or effect of diluting minority voting strength** . . . . . . . . . . . . . . . . . . . . . . 32

D. **The Court Should Adopt Cottonwood I as the Kansas State House of Representatives Plan** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

E. **The Court Should Adopt Buffalo 30 Revised SBOE as the Kansas Board of Education Plan** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

1. **The Court must base its map for the state board of education on its map for the state senate** . . . . . . . . . . . . . . . . . . . . . . . . . 33

2. **Buffalo 30 Revised SBOE is derived from the only senate redistricting plan to receive a constitutional majority in the Kansas Senate** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

3. **Buffalo 30 Revised SBOE is superior to For the People 13b-v1-SBOE because it does not gerrymander to the detriment of the sole African-American member of the Board of Education** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

4. **Buffalo 30 Revised SBOE is within the allowable constitutional deviations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

F. **The Competing Congressional Plans Are Inferior to Sunflower 9C or Sunflower 13** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

G. **The State Senate Plan Based upon For the People 13b_Is Inferior to Buffalo 30 Revised** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1. **For the People 13b never passed the Senate with a constitutional majority** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

2. **For the People 13b has wider deviations than Buffalo 30 Revised** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

3. The House of Representatives refused to create a new senate district for Johnson County, even though it created three new representative districts for Johnson County in Cottonwood I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

4. When viewed in terms of "traditional redistricting principles," For the People 13b does not serve basic notions of fundamental fairness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

H. The State Senatorial Plan Based Upon Wheat State 5 is Inferior to Buffalo 30 Revised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

1. Wheat State 5 never passed the Kansas Senate with a constitutional majority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

2. Wheat State 5 has wider deviations than Buffalo 30 Revised 43

3. When viewed in terms of "traditional redistricting principles," Wheat State 5 does not serve basic notions of fundamental fairness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

I. The State Representative Plans Based Upon Cottonwood II Are Inferior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

J. The State Board of Education Plan Based Upon For the People 13b-v1-SBOE is Inferior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# TABLE OF AUTHORITIES

**Cases:**

*Abrams v. Johnson*, 521 U.S. 74, 117 S.Ct. 1925, 138 L.Ed. 2d 285 (1997) . . . . 11, 24

*Brown v. Thomson*, 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) . . . . . 14

*Burns v. Rich*ardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966) . . . . . . 31

*Bush v. Vera*, 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) . . . . . . . . . 24

*Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975) . . . . . . . . . 14

*Colleton County Council v. McConnell*, 201 F.Supp.2d 618 (D.S.C. 2002) . . . . . 11

*Connor v. Finch*, 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed. 2d 465 (1977) . . . . . . . . 11, 14, 15

*Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) . . . . . 14, 31

*Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983) . . . . . 12

*Miller v. Johnson*, 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) . . . . . . 24

*Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed. 2d 506 (1964) . . . . . . . . 10, 11

*Shaw v. Hunt*, 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d (1996) . . . . . . . . . . . . . 24

*Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) . . . . . . . . . 24, 26

*Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed. 2d 725 (1982) . . . . . . . 11

*Voinovich v. Quilter*, 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) . . . . 14

*White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) . . . . . . . . 14

*White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973) . . . . . . . . . 11, 31, 33

*William v. Jeffersonville City Council*, 2003 U.S.Dist. LEXIS 4590,
**23-24 (S.D.Ind. Feb. 19, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**Constitutional Provisions and Statutes/Bills:**

United States Constitution, Article 1, Section 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10

Kansas Constitution, Article 6, Section 3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Kansas Constitution, Article 10, Section 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10

Sub. SB 256 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

SB 344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

HB 2371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

HB 2087 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8. 9, 17, 34

**Miscellaneous Sources:**

*Redistricting Law 2010* (National Conference of State Legislatures) . . . . . . . . . . . 37, 44

**COME NOW** Intervenor Plaintiffs Kansas Senator Thomas C. Owens, John E Henderson, Bernie Shaner, and Ron Wimmer ("Owens Intervenors"), and submit the instant memorandum in support of their proposed congressional, state legislative, and state board of education reapportionment and redistricting plans for the State of Kansas.[1]

## SUMMARY OF ARGUMENT

The State of Kansas has failed to enact a redistricting plan in its 2012 regular session as required by the federal and state constitutions. Accordingly, the Owens Intervenors ask that the court redraw the State's congressional and state redistricting maps to conform to, or adhere as closely as practicable to, the maps the Kansas Senate designated as follows: (1) Sunflower 9C (congressional); (2) Buffalo 30 Revised (state senatorial); (3) Cottonwood I (state representative); and (4) Buffalo 30 Revised SBOE (state board of education).[2]

Each of these four maps has been passed by the Kansas Senate with a constitutional majority of 21 votes. Furthermore, each of these maps has been submitted to and analyzed by the

---

[1] The Owens Intervenors base the facts they include in this memorandum on the evidence they anticipate will be admitted at trial, as well as from the parties' Joint Stipulation of Facts (Doc. 171), including the various exhibits attached thereto, and the public records, maps, analytical materials, and other public records, *see*, *e.g*., FRE 803(8), 901(b)(7), available electronically from the websites maintained by the Kansas Secretary of State, http://www.sos.ks.gov/elections/redistricting/ (Doc. 171, p. 15, para.89), Kansas Legislative Research Department (KLRD), http://redistricting.ks.gov/ (Doc. 171, p. 16, para. 91), and Kansas Legislature, http://kslegislature.org/li/ (Doc. 171, p. 16, para. 92).

Pursuant to their Joint Stipulation of Facts (Doc. 171), the parties have agreed that the Court may rely on the KLRD's documents, analysis packets (which were prepared for each congressional and state redistricting plan considered by the Legislature), census data, and Maptitude database, (Doc. 171, p. 15, para. 88), accessible at the KLRD's website. The parties have agreed that the documents on this website are admissible without further foundation or testimony. Similarly, they have agreed that the maps and reports accessible on the Secretary of State's website, and the legislation or legislative materials accessible on the Kansas Legislature's website, are admissible without further foundation or testimony.

[2] Each of these maps have been analyzed and vetted by the KLRD. They also have been passed by a constitutional majority of the Kansas State Senate. Graphical representations and statistical analyses of these maps are available on the websites maintained by the Kansas Secretary of State and KLRD, identified in footnote 1.

non-partisan Kansas Legislative Research Department ("KLRD"). During its vetting of these maps, the KLRD produced objective statistical measurements of each map's deviations from the constitutional ideal, potential dilution of minority voting strength, and preservation of the existing district's core.

The maps proposed by the Owens Intervenors cure the defects in the State of Kansas's existing congressional and state districting plans. They easily comply with the federal and state constitutional requirements (*e.g.*, each district in each map is well within the constitutionally mandated range for deviations from the ideal district size). And, they take into account the competing interests of people throughout the State of Kansas in a way that attempts to minimize the burdens borne by any region or district. Furthermore, they attempt to alleviate the tensions created by these potentially conflicting interests in a manner that is consistent with basic notions of fundamental fairness.

## STATEMENT OF FACTS

Following the 2010 Census, the Kansas Constitution, Article 10, Section 1, required the Kansas Legislature to reapportion the State's 40 state senatorial and 125 representative districts, and the United States Constitution, Article 1, Section 2, required the State to reapportion the State's 4 congressional districts. *Joint Stipulation of Facts*, paras. 31, 33, and 37 (Doc. 171). After completing a process that began as early as 2010, the Kansas Legislature failed to enact in its 2012 regular session any reapportionment and redistricting legislation as to these congressional or state districts, as well as its 10 state board of education districts, each of which are comprised of 4 contiguous state senate districts. *Id.*, para. 40; *see also* para. 38 (regarding state board of education).

However, each body of the Legislature passed one version or another of various reapportionment and redistricting plans. *See Joint Stipulation of Facts*, paras. 42, 74-87 (Doc. 171). For instance, following a thorough vetting by the non-partisan KLRD, the Kansas Senate passed a series of reapportionment and redistricting plans. *See id.*, paras. 42, 74-91. The Senate passed each of these plans by a constitutional majority of 21 votes, and it drew each of them so they contained districts well within the constitutional deviations. *Id.*; *see also* http://kslegislature.org/li/ (providing information regarding each bill, tracking the histories of the various bills, including committee action and floor vote counts); http://redistricting.ks.gov/ (providing statistical analysis of each proposed redistricting plan, by map name, including deviations for purposes of objective constitutional analysis).

## A. The Population Shift Reflected in the 2010 Census

In April, 2010, the United States Government conducted its decennial census as required by law. *Join Stipulation of Facts*, para. 31. Thereafter, the Census Bureau of the United States Department of Commerce ("Census Bureau") released detailed population data for the State of Kansas collected during the 2010 decennial census. *See* http://redistricting.ks.gov/_Census/census.html.[3] The data reflected that the State's population had increased 6.1% from the 2000 Census by approximately 164,700 to 2,853,118. *See id.* However, the pattern of growth was uneven across the State, with certain counties growing at a slower rate, or even declining in population, while others, such as Johnson County, grew at a much faster rate. *See id.*; see also http://redistricting.ks.gov/_Census/census_ks_misc.html (map of county-by-county population change available under tab entitled "Kansas Population Change").

---

[3] Detailed census data, and other similar public records, *see* FRE 803(8), 901(b)(7), are also available on the website maintained by the United States Department of Commerce, United States Census Bureau, http://www.census.gov.

The State's population increase did not affect the number of its United States Congressional districts (4). *Joint Stipulation of Facts*, para. 32 (Doc. 171). Nor did it affect the number of its state senate districts (40), state representative districts (125), or state board of education districts (10), the number of each being fixed by the Kansas Constitution. *See id*., para. 36.

However, the population change did affect the ideal size of its congressional and state districts. *See Joint Stipulation of Facts*, paras. 34, 37-38 (Doc. 171). After the 2010 Census, the ideal size of its congressional districts rose to 713,280, and, after adjusting the census data as required by the Kansas Constitution,[4] the ideal sizes of its state districts rose, respectively, to 70,986 for senatorial districts, 22,716 for representative districts, and 283,944 for board of education districts.[5] *Id*.

The State's uneven population change had profound effects on the relative apportionment of its congressional, legislative, and board of education districts. *Joint Stipulation of Facts*, para. 41 (Doc. 171). For instance, the population variation reflected in the 2010 Census, as adjusted, resulted in severe malapportionment of many State senatorial and representative districts. *Id*. Overall, the state senatorial districts varied in deviation from the ideal district size by a range of 86.2% to 130.8% of ideal, and the state representative districts varied in deviation from the ideal district size by a range of 71.0% to 174.3%. *See* http://redistricting.ks.gov/_Census/census_ks_misc.html (report and tables, attached to cover letter dated July 29, 2011, addressed to Kansas Legislature, from Corey Carnahan, Principal

---

4 After adjusting the 2010 Census data in the manner required by Kansas Constitution, Article 10, Section 1, the State's 20120 adjusted population is 2,839,445. *See Joint Stipulation of Facts*, para. 37 (Doc. 171).

5 The ideal population sizes for each state district are calculated by dividing the adjusted population by the number of districts; *e.g*., for the ideal senate district, the adjusted population is divided by 40, for the ideal representative district, the adjusted population is divided by 125, and for the ideal board of education district, the ideal district is divided by 10. *See Joint Stipulation of Facts*, paras. 34, 36-39 (Doc. 171).

Analyst KLRD, and Alan D. Conroy, Director KLRD, available under tab entitled "Kansas 2010 Census Adjusted Population").

**B. <u>The Redistricting Process</u>**

The Kansas Constitution requires the Legislature to reapportion the state senatorial and representative districts at its regular session every tenth year after 1992. *Joint Stipulation of Facts*, para. 37 (Doc. 171); Kan. Const., Art. 10, Sec. 1. The reapportionment is to be made on the basis of the State's population as established by the most recent census taken and published by the Census Bureau. *Id*. This census data is then adjusted to include or exclude certain military personnel and college and university students. *Id*.

**1. <u>The Legislature's Preparation for Redistricting</u>**

In anticipation of its obligation to redistrict in the 2012 regular session, the Kansas Legislature released preliminary information to legislators and members of the public. *See Joint Stipulation of Facts*, para. 43-44 (Doc. 171); *id*., Exs. 1-8. As part of the process, the Legislature formed a Joint Special Committee on Redistricting that conducted public meetings throughout the State. Senator Thomas C. Owens was one of the co-chairs of the Joint Special Committee. *Id*. He participated in the public meetings the Joint Special Committee conducted throughout the State. *Id*. These meetings began in July, 2011 and continued through October, 2011. *Id*.

At the meetings, the members of the Joint Special Committee sought input which would help inform the Legislature as it attempted to complete a lawful and fair redistricting plan. *See Joint Stipulation of Facts*, para. 43-44 (Doc. 171); *id*., Exs. 1-8. For instance, the members of the Committee requested public comments related to the specific concerns of citizens in areas across the State that might aid in identifying communities of interest the Legislature should consider

when drawing the district lines. *See id*., Exs. 1-8. The Committee took written minutes of each of these meetings. *See id*.

After the commencement of the 2012 regular legislative session, following the conclusion of the public hearings, the Legislature took up the question of developing congressional, state legislative, and state board of education districts. *See Joint stipulation of Facts*, paras. 43-87 and Exs. 11-27 (minutes and testimony from House committee meetings), 28-43 (minutes and testimony from Senate committee meetings), and 44-87 (various reapportionment and redistricting plans considered by the Legislature)(Doc. 171).

In the Senate, the Committee on Reapportionment was responsible for considering redistricting legislation, and in the House of Representatives, the Committee on Redistricting was responsible for such legislation. Senator Thomas C. Owens chaired the Senate Committee, and Speaker Michael O'Neal chaired the House Committee. *See Joint Stipulation of Facts*, paras. 45-48 and Exs. 9-10 (Guidelines and Criteria and Technical Committee Rules), 27-28, and 43. Both Senator Owens and Speaker O'Neal have intervened as plaintiffs in this action. *Id*., paras. 19-20; *see also Order* (Doc. 103)(minute entry of order granting Owens Intervenors' motion to intervene); *Memorandum and Order* (Doc. 155)(written order granting all motions to intervene).

**2. Redistricting Criteria**

To guide their consideration of issues related to congressional and state redistricting, the Senate and House Committees adopted the same written standards, entitled "Guidelines and Criteria for 2012 Kansas Congressional and Legislative Redistricting" ("Guidelines"), prepared by the non-partisan KLRD. *Joint Stipulation of Facts*, para. 45-46 and Ex. 9. The Senate Committee approved the Guidelines on April 28, 2011, and the House approved them on January

9, 2012. *Id*., Ex. 9. The Guidelines attempted to set forth redistricting requirements from federal and state law, including the United States and Kansas Constitutions. *See id*.

With respect to state legislative redistricting, the Guidelines provide that the districts should be numerically as equal in population as practical within the limitations of census geography, and deviations should not exceed plus or minus 5 percent of the ideal population of 22,716 for each House district and 70,986 for each Senate district, except in unusual circumstances. *Joint Stipulation of Facts*, para. 45 and Ex. 9 (Doc. 171). The Guidelines also provide that redistricting plans will have neither the purpose nor effect of diluting minority voting strength. *Id*. Furthermore, subject to the requirement that districts be as numerically equal as possible, the Guidelines provide that (1) the building blocks to be used for drawing district boundaries shall be voting districts ("VTDs") as described on official 2010 Redistrict U.S. Census maps; (2) districts should be as compact as possible and contiguous; (3) the integrity and priority of existing political subdivisions should be preserved to the extent possible; (4) there should be a recognition of similarities of interest; (5) contests between incumbent members of the Legislature or Board of Education should be avoided whenever possible; and (6) districts should be easily identifiable and understandable by voters. *Id*.

With respect to congressional redistricting, the Guidelines provide that districts are to be as nearly equal as possible to a population of 713,280. *Joint Stipulation of Facts*, para. 45 and Ex. 9 (Doc. 171). The Guidelines also provide that redistricting plans will have neither the purpose nor effect of diluting minority voting strength. *Id*. Furthermore, subject to the requirement that districts be nearly as equal in population as possible, the Guidelines also provide that districts should be as compact as possible and contiguous. *Id*. Again, subject to the requirement that districts be nearly as equal in population as possible, the Guidelines provide

further that districts should attempt to recognize "community of interests" when that can be done. In this respect, the Guidelines instruct that (1) social, cultural, racial, ethnic, and economic interests common to the population of the area should be considered, (2) if possible, and considering the "community of interests," the core of existing districts should be preserved in establishing districts, and (3) whole counties should be in the same congressional district to the extent possible while achieving population equality among districts. *Id*.

### 3. <u>Legislative Activity Leading Up to the Senate's Adoption of Sunflower 9C and the Committee's Passing of Sunflower 13</u>

The Kansas Senate passed only one congressional map. *See Joint Stipulation of Facts*, para. 74 and Exs. 91-93. On February 8, 2012, the Senate passed SB 344 by a vote of 23-17, which constituted a constitutional majority. *Id*. SB 344 contained the congressional map designated as "Sunflower 9C. *Id*.

### 4. <u>Legislative Activity Leading Up to the Senate's Adoption of Buffalo 30 Revised</u>

The Kansas Senate passed two maps redistricting senatorial districts. On May 1, 2012, the Kansas Senate passed HB 2371, which contained, among other things, the map designated Ad Astra Revised JOCO Wichita 3. *Joint Stipulation of Facts*, para. 81 (Doc. 171). On May 18, 2012, the Kansas Senate passed HB 2087, which contained, among other things, the map designated Buffalo 30 Revised. *Id*. at para. 87.

### 5. <u>Legislative Activity Leading Up to the Senate's Adoption of Cottonwood I</u>

The Kansas Senate passed only one map redistricting representative districts. On May 1, 2012, the Kansas Senate passed HB 2371, which contained, among other things, the map designated Cottonwood I. *Joint Stipulation of Facts*, para. 81 (Doc. 171).

**6. Legislative Activity Leading Up to the Senate's Adoption of Buffalo 30 Revised SBOE**

The Kansas Senate passed two maps redistricting the state board of education, both of which accompanied their respective senatorial redistricting maps. On May 1, 2012, the Kansas Senate passed HB 2371, which contained, among other things, the map designated Ad Astra Revised-SBOE. *Joint Stipulation of Facts*, para. 81 (Doc. 171). On May 18, 2012, the Kansas Senate passed HB 2087, which contained, among other things, the map designated Buffalo 30 Revised-SBOE. *Id*. at para. 87.

**7. The House of Representatives' Refusal to Adopt the Kansas Senate's Plan for Senatorial Redistricting Broke a Long-standing Tradition of the Kansas Legislature.**

The Owens Intervenors anticipate that the evidence will demonstrate that until the 2012 regular session, the Kansas Legislature adhered to a long-standing and unbroken tradition of comity and deference in considering and enacting reapportionment and redistricting legislation. Historically, the Kansas Legislature adhered to a tradition in which each body drew its own redistricting plan, and the other body deferred to that plan. In other words, the House of Representatives adopted the plan the Senate passed for the Senate districts, and the Senate adopted the plan the House of Representatives passed for the House of Representative districts. The House of Representatives' refusal to adopt the Senate's plan for Senate redistricting conflicted with this long-standing and unbroken Kansas tradition.

Although the House of Representatives deviated from tradition in the 2012 regular session, the Senate continued to honor tradition by adopting Cottonwood I, the House of Representative's plan for the House of Representative districts. *See Joint Stipulation of Facts*, para. 81 (Senate passed HB 2371, containing Cottonwood I, along with a Senate redistricting

plan (and accompanying board of education plan), designated Ad Astra Revised JOCO Wichita 3 and Ad Astra Revised-SBOE, by a vote of 21-19).

## ARGUMENT

The United States and Kansas Constitutions vest in the Kansas Legislature the responsibility for congressional and state redistricting. *See* U.S Const., Art. 1, Sec. 2; Kan. Const., Art. 10, Sec. 1. However, where a state fails to enact a redistricting plan of any kind, and where a population shift has rendered its existing plan unconstitutional, the federal courts reluctantly step in to remedy the state's inaction by drawing districts that comply with the federal and state constitutions and that satisfy basic notions of fundamental fairness to voters throughout the state. *See, e.g., Reynolds v. Sims*, 377 U.S. 533, 578, 585-586, 84 S.Ct. 1362, 12 L.Ed. 2d 506 (1964).

The State of Kansas has failed to enact a redistricting plan in its 2012 regular session as required by the federal and state constitutions. The Owens Intervenors ask that the Court redraw the State's congressional and state redistricting maps to conform to, or adhere as closely as practicable to, the maps the Kansas Senate designated as follows: (1) Sunflower 9C (congressional redistricting plan); (2) Buffalo 30 Revised (state senatorial redistricting plan); (2) Cottonwood I (state representative redistricting plan); and (3) Buffalo 30 Revised SBOE (state board of education redistricting plan);

### A. United States Supreme Court Precedent and Federal Standards Guide the Court's Implementation of Remedial Reapportionment and Redistricting Plans for the State of Kansas

There appears to be no dispute that the State of Kansas's congressional, state legislative, and state board of education districts are unconstitutional. *See Trial Order*, p. 1 (Doc. 82)(observing that "the unconstitutionality of the existing Congressional, State Legislative and

State Board of Education districts is uncontested”). Where a federal court is satisfied that the governing officials of a state cannot complete the requisite redistricting in time for an impending election, it must take steps “to insure that no further elections are conducted under the invalid plan[s],” *Reynolds*, 377 U.S. at 585, and to implement remedial districting plans, *see Connor v. Finch*, 431 U.S. 407, 415, 97 S. Ct. 1828, 52 L. Ed. 2d 465 (1977).

In implementing a court-ordered remedial plan for malapportioned congressional and legislative districts, a federal court must always act “circumspectly, and in a manner free from any taint of arbitrariness or discrimination.” *Connor*, 431 U.S. at 415. A federal court, unlike a state legislature, is not in a position to reconcile conflicting state policies on the electorate’s behalf, nor at liberty to engage in political policy-making decisions. *Connor*, 431 U.S. at 415; *cf. Colleton County Council v. McConnell*, 201 F.Supp.2d 618, 629 (D.S.C. 2002) (writing that “[w]hile all parties are entitled to advocate a legislative redistricting plan that furthers their partisan interests, it is inappropriate for the court to engage in political gerrymandering”).

However, to the extent possible, a federal court will follow traditional state districting principles, as well as the policies and preference of the state as expressed in its constitutional and statutory provisions, or in its historical reapportionment plans. *See, e.g., Abrams v. Johnson*, 521 U.S. 74, 79, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997) (writing that “[w]hen faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act.”) (citing *Upham v. Seamon*, 456 U.S. 37, 43, 71 L.Ed.2d 725, 102 S.Ct. 1518 (1982)); *White v. Weiser*, 412 U.S. 783, 795, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973)(acknowledging the rule that a federal district court, in the context of legislative reapportionment, “should follow the policies and preferences of the State, as

expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to the state policy does not detract from the requirements of the Federal Constitution,….”).

## B. The Court Should Adopt Sunflower 9C or Sunflower 13 as the Congressional Plan

The United States Supreme Court has developed a standard of population equality requiring that congressional districts be mathematically equal, unless justified by some "legitimate state objective." *See Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983).

### 1. Both Sunflower 9C and Sunflower 13 are within the allowable constitutional deviations

The ideal congressional district population is 713,280. According to the non-partisan KLRD's analysis of the 2010 Census data, and its vetting of the two proposed maps, both Sunflower 9C and Sunflower 13 satisfy the constitutional requirement that a congressional district be mathematically equal.

Sunflower 9C splits the State's population among the four districts as follows: the 1st District, 713,278 (a deviation from the ideal of -2 persons); the 2nd District, 713,279 (a deviation from the ideal of -1 persons); the 3rd District, 713,280 (a deviation from the ideal of 0 persons); and the 4th District, 713,281 (a deviation from the ideal of 1 persons).

Sunflower 13 splits the State's population among the four districts as follows: the 1st District, 713,278 (a deviation from the ideal of -2 persons); the 2nd District, 713,280 (a deviation from the ideal of 0 persons); the 3rd District, 713,280 (a deviation from the ideal of 0 persons); and the 4th District, 713,280 (a deviation from the ideal of 0 persons).

2. **Although the Owens Intervenors prefer Sunflower 9C because the Senate passed it by a constitutional majority, they do not object to Sunflower 13, which was on the Senate's calendar at the time of adjournment**

The Owens Intervenors believe that both Sunflower 9C and Sunflower 13 satisfy the constitutional requirements, as well as basic notions of fundamental fairness.[6] They prefer Sunflower 9C because it has passed the Senate by a vote of 23-17, a constitutional majority, *see Joint Stipulation of Facts*, para. 74 (Doc. 171); however, they do not object to Sunflower 13, which was on the Senate calendar at the time the Senate adjourned Saturday, May 19, 2012, but it did not receive a floor vote.

In order to avoid duplication, the Owens Intervenors incorporate by reference the analysis of the competing congressional plans submitted by the Davis Intervenors. With respect to the congressional map, and with the exception of the Owens Intervenors' preference for Sunflower 9C, the Owens' Intervenors' interests are aligned with those of the Davis Intervenors. Furthermore, the Owens Intervenors also have no objection to the plan known as Free Willy, which they anticipate will be proposed by the Intervenor-Plaintiffs Paul Davis and William Roy Jr. ("the Davis Intervenors").

C. **The Court Should Adopt Buffalo 30 Revised as the Kansas State Senate Plan**

When examined under the constitutional standards for deviations from the ideal, and when viewed with an eye toward basic notions of fundamental fairness, Buffalo 30 Revised is superior to the competing plans offered by the other parties. (It also is superior to the current senatorial redistricting plan when it was vetted and, ultimately, approved in 2002).

---

[6] The maps and statistical analyses for Sunflower 9C are available on the KLRD's website, http://redistricting.ks.gov/_Plans/Proposed_Plans/m5_sunflower9c/m5_sunflower9c.html, and the Kansas Secretary of State's website, http://www.sos.ks.gov/elections/redistricting/Maps/Congressional/M5_Sunflower%209C/. The maps and statistical analysis for Sunflower 13 are available on the same websites.

Buffalo 30 Revised has narrower deviations than the other senate plans proposed by the parties, it was the only such plan passed by a constitutional majority of the Senate, it is the only such plan that accommodates the explosive growth in Johnson County by providing Johnson County with another senate district, it produces a fairer result than plans that do not collapse a district, and it is more faithful to the "traditional districting principles" commonly applied by federal courts asked to redraw redistricting plans as a result of state legislative inaction.

**1. <u>Buffalo 30 Revised is within the allowable constitutional deviations</u>**

The United States Supreme Court has developed a standard of population equality requiring that state legislative districts differ by no more than 10% from the smallest to the largest, unless justified by some "rational state policy." *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *see also Voinovich v. Quilter*, 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993); *Brown v. Thomson*, 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983); *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). The constitutional standard described by the overall deviation range of 10% translates into a relative deviation range of plus or minus 5% of the ideal population size.

However, where a federal court draws a state legislative plan, it appears that the allowable statistical variation is narrower than the 10% deviation that applies to review of a state drawn plan. *Connor*, 431 U.S. at 417-18; *Chapman*, 420 U.S. at 26-27 and n.19. Where a state legislature has failed to devise a reapportionment and redistricting plan, the United States Supreme Court has explained as follows:

> [w]e have made clear that in two important respects a court will be held to stricter standards in accomplishing its task than the state legislature: "[U]nless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember

> districts, and, as well, must ordinarily achieve the goal of population equality with little more than de minims variation."

*Connor*, 431 U.S. at 413 (quoting *Chapman*, 420 U.S. at 26-27).

In *Chapman v. Meier*, the Supreme Court held "unless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature…must ordinarily achieve the goal of population equality with little more than *de minimis* variation." *Chapman*, 420 U.S. at 26-27. In a footnote, the Court observed that "[t]his is not to say, however, that court-ordered reapportionment of a state legislature must attain the mathematical preciseness required for congressional redistricting…." *Id*. at 27, n.19. But, the Court cautioned that "[w]here important and significant state considerations rationally mandate departure from these standards, it is the reapportioning court's responsibility to articulate precisely why a plan of single-member districts with minimal variance cannot be adopted." *Id*. at 27.

Of the reapportionment and redistricting plans before the Court, Buffalo 30 Revised has the narrowest range of deviations from the ideal.[7] The ideal population size for a Kansas senate district is 70,986 persons. According to analysis performed by the non-partisan KLRD, Buffalo 30 Revised can be broken down into the following summary statistics: (1) it has a district population range with a low of 68,831 persons and a high of 73,187 persons (both within the constitutional standard); (2) it has an absolute district population range of 2,155 persons less than ideal of 70,986 persons up to 2,201 persons more than the ideal; (3) it has a relative district population range of -3.04% of the ideal up to 3.10% of the ideal (both within the constitutional range of plus or minus 5% of the ideal population size); and (4) it has a relative overall range of 6.14% (within the constitutional range of 10.0%).

---

[7] The map and statistical analyses for Buffalo 30 Revised are available on the KLRD's website, http://redistricting.ks.gov/_Plans/Proposed_Plans/M5_Buffalo%2030%20Revised/m5_buffalo30revised.html (map and statistical analysis for Buffalo 30 Revised), and the Kansas Secretary of State's website, http://www.sos.ks.gov/elections/redistricting/Senate/M5_Buffalo%2030%20Revised/.

Furthermore, according to analysis performed by the non-partisan KLRD, and published in its summary population report for Sub. SB 256, Buffalo 30 Revised has tighter deviations than did the current senatorial districting plan when the KLRD vetted it in 2002.[8] Under the 2002 Census, adjusted as required by the Kansas Constitution, the ideal senatorial district was 66,806 persons. When it was vetted in 2002, the current plan had (1) a district population range with a low of 63,648 persons and a high of 69,839 persons; (2) it had an absolute district population range of 3,158 persons less than ideal of 66,806 persons up to 3,033 persons more than the ideal (which equates to an absolute overall range of 6,191 persons, which is greater than the absolute overall range for Buffalo 30 Revised—4,356 persons); (3) it had a relative district population range of -4.73% of the ideal up to 4.54% of the ideal (which is a larger range than Buffalo 30 Revised); and (4) it had a relative overall range of 9.27% (which is greater than the relative overall range of Buffalo 30 Revised).

**2. Buffalo 30 Revised is the only plan presented to the Court that passed the Senate with a constitutional majority of 21 votes, it is the only plan before the Court to receive bipartisan support in the Senate, and it is the only plan that reflects the will of the Senate to collapse a senate district to accommodate the continued growth in Johnson County**

The Owens Intervenors anticipate that the evidence will shed light on the process followed by the Senate Committee on Reapportionment in considering senatorial redistricting plans. Early in the redistricting process, Senator Owens asked the Senate Committee on Reapportionment to consider whether to collapse a district to accommodate the growth in Johnson County. A motion was made not to collapse a district, and the Committee voted that motion down 9-4, choosing, instead, to entertain plans to collapse a district in order to add a

[8] The map and statistical analyses for the current senatorial districting plan, Sub. SB 256, are available on the KLRD's website, http://redistricting.ks.gov/_Plans/Current_Plans/SenatePlan21AA/subsb256.html.

district in Johnson County. Consistent with this decision, the Committee never passed out a bill that did not collapse a district.

Ultimately, the Kansas Senate passed only two senatorial redistricting bills, and both bills included a collapse. *See Joint Stipulation of Facts*, paras. 81 (Ad Astra) and 87 (Buffalo 30 Revised)(Doc. 171). These two bills were designated Ad Astra Revised and Buffalo 30 Revised. *Id*. These are the only two bills to receive a constitutional majority of 21 votes; neither the For the People series nor the Wheat State series of senatorial redistricting plans received 21 votes, *see*, *e.g*., *id*. paras. 78 (For the People 6), 82 (Wheat State 1), 83 (For the People 12). (Indeed, in an unrecorded vote, even the House of Representatives voted down an amendment introducing Wheat State 5, *see id*. para. 85).

Ad Astra Revised collapsed Senate districts 36 and 38, in Western and North Central Kansas.[9] However, its deviations were broader than those found in Buffalo 30 Revised (*i.e.*, Ad Astra had an overall deviation of 9.99%, whereas Buffalo 30 Revised has an overall deviation of 6.14%). Moreover, it collapsed districts in portions of the State that already had been the subject of a previous collapse in 2002.

In an effort to improve on Ad Astra Revised, Senator Owens introduced Buffalo 30 Revised in the Senate Committee on Reapportionment on May 10, 2012. Buffalo 30 Revised was inserted into HB 2087, which was passed favorably out of the Senate Committee on May 12, 2012. The full Senate then passed HB 2087 on May 19, 2012, by a vote of 21-17, with 13 Republicans and 8 Democrats voting in favor.

---

[9] The map and statistical analysis for Ad Astra Revised are accessible on the KLRD's website, http://redistricting.ks.gov/_Plans/Proposed_Plans/m1_astra_revised/m1_adastra_revised.html (map and statistical analysis for Ad Astra Revised), and the Kansas Secretary of State's website, http://www.sos.ks.gov/elections/redistricting/Senate/M1_Ad%20Astra%20Revised/.

Buffalo 30 Revised is the only plan before the Court that passed the Senate by a constitutional majority of 21 votes, and it is the only plan before the Court that received bi-partisan support in the Senate.

**3. <u>Buffalo 30 Revised accommodates the continued growth of Johnson County by adding another senate district</u>**

Between the 2000 decennial census and the 2010 decennial census, Johnson County's population grew by 93,063 persons, which translates to a population increase of 20.64%.[10] No other Kansas county came close to Johnson County's absolute population increase. (Douglas County was next closest with an increase of 10,864 persons.)[11] The absolute increase in Johnson County's population is greater even than the ideal size of a state senatorial district, 70,986, *see Joint Stipulation of Facts*, para. 37 (Doc. 171). When the population increase is adjusted as required by the Kansas Constitution, the average deviation of the seven current Johnson County senatorial districts exceeds the ideal district size by more than 9%.[12] If one divides the population of Johnson County (544,179) by the ideal size for a senate district (70,986), Johnson County is entitled to 7.66 senate districts.

Buffalo 30 Revised recognizes this explosive growth, and accommodates Johnson County's need for an additional senate seat by collapsing current senate districts 32 and 16, which are in counties with either decreasing populations or slower population growth. (Sumner County lost 1,814 persons, which translates to a growth rate of -6.99%; Cowley County gained

---

[10] The KLRD website has a map, entitled "Kansas Counties with Percent Population Change 2000 to 2010." It shows that Johnson grew by 93,093 persons, which translates to a change of 20.64%. *See* http://redistricting.ks.gov/_Census/census_ks_misc.html (tab entitled "Kansas Population Change").

[11] The Percent Population Change map shows that Douglas County grew by 10,864 persons, which translate to a change of 10.864%. *See* http://redistricting.ks.gov/_Census/census_ks_misc.html (tab entitled "Kansas Population Change").

[12] This information is available from the table entitled "2010 Adjusted Population Data (By Kansas Senate District)" attached to the KLRD's letter to the Kansas Legislature, dated July 29, 2010. It is posted on the KLRD's website, http://redistricting.ks.gov/_Census/census_ks_misc.html. The report, and corresponding table, is available at the tab entitled "Kansas 2010 Census Adjusted Population." Currently, the seven senatorial districts in Johnson County are 7th, 8th, 9th, 10th, 11th, 23rd, and 37th

20 persons, which translates to a growth rate of .06%; and Butler County gained 6,398 persons, which translates to a growth rate of 10.76%).[13]

The decision to collapse a senatorial district is consistent with the Senate's precedent, established in 1992 and repeated in 2002. Most recently, during the 2002 reapportionment and redistricting process, the Kansas Legislature also faced a situation where Johnson County's growth demanded that it receive an additional senate district. The Legislature chose to accommodate that growth by collapsing a senate district, the 37th, in Western Kansas. Similarly, during the 1992 reapportionment and redistricting process, the Kansas Legislature faced a growing population in Johnson County, and it accommodated that growth by collapsing a district in North Central Kansas, the 23rd.

Buffalo 30 Revised represents a continuation of legislative precedent: it collapses districts in slower growing or declining areas of the State to add a senate seat where needed elsewhere. Recognizing that North Central and Western Kansas have borne the burden of collapse during the past two redistricting cycles, Buffalo 30 Revised attempts to spread the burden fairly among regions of the State with slow or negative population growth. This time, the Senate attempted to accomplish this goal by collapsing two districts in South Central Kansas, the 32nd and the 16th, rather than drawing from Western Kansas, as it did in 2002, or North Central Kansas, as it did in 1992.

#### 4. Collapsing a senate district in South Central Kansas produces the fairest result of any of the plans before the Court

The parties have proposed two different types of senate reapportionment and redistricting plans. Buffalo 30 Revised, which is the first type of plan, collapses a senate district in order to create a new district in Johnson County. For the People 13b and Wheat State 5, which are the

---

[13] *See* http://redistricting.ks.gov/_Census/census_ks_misc.html.

second type, do not collapse a district; instead, they shift the boundaries of existing districts to attempt to absorb the increased population.[14]

The two types of plans result in markedly different outcomes for the people of the State of Kansas. Under Buffalo 30 Revised, the 32nd District, essentially, is moved from South Central Kansas to Johnson County. The current incumbent in the 32nd District, Senator Abrams, a Republican, is placed in the 16th District, where the incumbent also is a Republican. However, the Senate currently is comprised of 32 Republicans and 8 Democrats. Collapsing the 32nd District will not influence the Senate's political or competitive balance. Republicans still will hold an overwhelming majority.

Additionally, as a result of collapsing the 32nd District and moving it into Johnson County, Buffalo 30 Revised is able to draw Johnson County districts "light" in relation to their deviations from the ideal district size. In Buffalo 30 Revised, there are eight senate districts in Johnson County: the 7th, 8th, 9th, 10th, 11th, 23rd, 32nd, and 37th. Each has a population smaller than the ideal size, which results in the deviations under the ideal district size. Given that the constitutional standard requires deviations of no more than 5% above the ideal size, Buffalo 30 Revised provides some cushion for future population growth that could mitigate the risk of continuing constitutional violations due to overpopulated senate districts in Johnson County.[15]

---

[14] Maps and statistical data for all of the proposed senatorial redistricting plans, including Buffalo 30 Revised, For the People 13b, and Wheat State 5, are available at the websites maintained by the KLRD and the Kansas Secretary of State. For the KLRD, the address is: http://redistricting.ks.gov/_Plans/plans_proposed_3.html. For the Kansas Secretary of State, the website is: http://www.sos.ks.gov/elections/redistricting/Senate/.

[15] Additionally, continuing with this theme, Buffalo 30 Revised tends to draw senate districts slightly "heavier" in areas of the State that have experienced slower growth or decreasing populations—*e.g.*, Western Kansas (34th, 35th, 36th, 38th, and 40th) and Southeastern Kansas (12th, 13th, 14th, 15th, and 17th), with deviations ranging from 02.75% to 0.95%. Oddly, For the People 13b takes the contrary approach, tending to draw districts in these parts of the State relatively "light," which is exactly the opposite of the approach one would expect in areas of little or no population growth. For instance, For the People 13b draws all but one of the districts in Southeast Kansas more than 2% under the ideal.

In this respect, the populations and deviations in Buffalo 30 Revised are as follows: (1) the 7th District has a population of 70,453, which falls below the ideal by 553, and results in a percent deviation of -0.75%; (2) the 8th District has a population of 70,666, which falls below the ideal by 320, and results in a percent deviation of -0.45%; (3) the 9th District has a population of 69,702, which falls below the ideal by 1,284, and results in a percent deviation of -1.81%; (4) the 10th District has a population of 70,066, which falls below the ideal by 920, and results in a percent deviation of -1.30%; (5) the 11th District has a population of 70,431, which falls below the ideal by 555, and results in a percent deviation of -0.78%; (6) the 23rd District has a population of 70,544, which falls below the ideal by 442, and results in a percent deviation of -0.62%; and (7) the 37th District has a population of 68,923, which falls below the ideal by 2,063, and results in a percent deviation of -2.91%.

On the other hand, under the non-collapse plans, For the People 13b and Wheat State 5,[16] three different senate districts, the 3rd and 19th Districts, each of which is held by a Democrat, are redrawn in a way that fundamentally changes their shapes, their core constituencies, and their communities of interest. The burden of accommodating the increased growth of Johnson County is placed squarely upon these districts, and the incumbents who hold them. Additionally, although perhaps the result of pure happenstance, the Democrats who hold these two districts are the Democratic nominee for governor in the last gubernatorial election (Tom Holland, the 3rd District) and the current Senate Minority Leader (Anthony Hensley, the 19th District).

---

[16] The maps and statistical analyses relating to For the People 13b are available on the KLRD's website, http://redistricting.ks.gov/_Plans/Proposed_Plans/M5_For%20The%20People%2013b/M5_For%20The%20People%2013b.html, and the Kansas Secretary of State's website, http://www.sos.ks.gov/elections/redistricting/Senate/M5_For%20The%20People%2013b/. Similarly, the maps and statistical analyses for Wheat State 5 are available on the KLRD's website, http://redistricting.ks.gov/_Plans/Proposed_Plans/sen%20floor%20amendments/consolidated_ws-5.pdf, and the Kansas Secretary of State's website, http://www.sos.ks.gov/elections/redistricting/Senate/M5_Wheat%20State%205/.

With respect to the 3rd District, the non-collapse plans redraw it to remove part of Douglas County and all of Jefferson County. They then add part of Johnson County, which requires that a narrow strip be pulled from the eastern border of Douglas County, which currently delineates the district, past DeSoto and on into Olathe. As a result of this newly misshapen district, Senator Holland picks up 35,446 Johnson County constituents, and he loses approximately 43,500 of his current constituents in rural Douglas and Jefferson Counties. Additionally, the newly drawn 3rd District mixes constituents with rural interests with those with urban interests, which changes the rural flavor of the former district.

With respect to the 19th District, the non-collapse plans redraw it to remove a large portion of East Topeka and all of Osage County, resulting in a loss of 22,548 current constituents, of which nearly 10,000 are from Topeka, where Senator Hensley resides, and has represented constituents for over 36 years. They then add Jefferson County and part of rural Douglas County, which adds 29,045 new constituents, over 16,000 of which Senator Hensley has never represented. The newly drawn district removes the urban core of the former district and replaces it with largely rural constituents, which changes the urban flavor of the former district.

Furthermore, the non-collapse plans attempt to absorb the increased population in Johnson County by shifting the borders of adjacent districts. This results in the Johnson County districts being drawn "heavy" in relation to their deviations from the ideal district size. In the non-collapse plans, there are eight districts with Johnson County constituents: the 3rd, 7th, 8th, 9th, 10th, 11th, 23rd, and 37th. Each has a population greater than the ideal size, which results in the deviations over the ideal district size. Given that the constitutional standard requires deviations of no more than 5% above the ideal size, the non-collapse plans seemingly ensure continuing constitutional violations due to overpopulated senate districts in Johnson County.

The populations and deviations for the 8 senate districts with Johnson County constituents are identical in For the People 13b and Wheat State 5. They are as follows: (1) the 3rd District has a population of 73,071, which exceeds the ideal by 2,085, and results in a percent deviation of 2.94%; (2) the 7th District has a population of 72,996, which exceeds the ideal by 2,010, and results in a percent deviation of 2.83%; (3) the 8th District has a population of 72,757, which exceeds the ideal by 1,771, and results in a percent deviation of 2.49%; (4) the 9th District has a population of 72,662, which exceeds the ideal by 1,676, and results in a percent deviation of 2.36%; (5) the 10th District has a population of 72,391, which exceeds the ideal by 1,405, and results in a percent deviation of 1.98%; (6) the 11th District has a population of 72,395, which exceeds the ideal by 1,409, and results in a percent deviation of 1.98%; (7) the 23rd District has a population of 72,948, which exceeds the ideal by 1,962, and results in a percent deviation of 2.76%; and (8) the 37th District has a population of 72,948, which exceeds the ideal by 1,962, and results in a percent deviation of 2.76%.

In summary, Buffalo 30 Revised collapses a district in South Central Kansas, resulting in a single Republican incumbent being placed in the 16th District with another Republican incumbent. The collapse creates an additional district in Johnson County, which continues to experience an undeniable explosion in growth. The result is that two members of a party with 32 of 40 seats in the Kansas Senate will run against one another, and, in exchange, a County that is entitled to 7.66 senate districts receives 8, which allows these districts to be drawn light, and which leaves a buffer to absorb the County’s continued growth through the next decennial census.

On the other hand, For the People 13b and Wheat State 5 attempt to absorb the population increase by shifting the borders of existing districts in a fashion that jeopardizes two

members of the Democratic leadership, it also draws 7 heavy districts in a County with a history, and nearly certain future, of electoral malapportionment due to overpopulation. Plainly, Buffalo 30 Revised, and its collapse of a district to alleviate the population pressure in Johnson County, is the fairer result under the circumstances.

### 5. When viewed in terms of "traditional redistricting principles," Buffalo 30 Revised serves basic notions of fundamental fairness

Where federal courts are forced to draw reapportionment and redistricting plans because state legislatures have failed to act, they attempt to produce a plan that not only is constitutional but also serves basic notions of fundamental fairness to voters throughout the state. In this respect, they are guided by certain policies commonly known as "traditional redistricting principles." *See, e.g.*, *Abrams*, 521 U.S. at 84-95; *Bush v. Vera*, 517 U.S. 952, 959, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); *Shaw v. Hunt*, 517 U.S. 899, 907 n.3, 116 S.Ct. 1894, 135 L.Ed.2d (1996); *Miller v. Johnson*, 515 U.S. 900, 919, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995); *Shaw v. Reno*, 509 U.S. 630, 647, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Among these principles are the following: (1) districts should be composed of contiguous territory; (2) districts must be compact; (3) districts should attempt to preserve communities of interest; (4) districts should respect political subdivisions; (5) districts should maintain their cores; and (6) incumbents should be protected from contests with each other. *Id*.

The "traditional redistricting principles" are identical to the standards found in the Guidelines and Criteria for 2102 Kansas Congressional and Legislative Redistricting ("the Guidelines") that were adopted by the Senate Committee on Reapportionment, chaired by Senator Owens. The Senate Committee considered its various state legislative plans, including Buffalo 30 Revised, in light of the "traditional redistricting principles" set forth in the

Guidelines. These are the very same standards the Court will consider when evaluating the parties' proposed plans, and, ultimately, in designing its own plan for the State.

Not only is Buffalo 30 Revised well-within the allowable constitutional deviations, but it also is drawn in a way that serves the policies underlying each of the "traditional districting principles" as articulated in the Guidelines. In the few instances in which Buffalo 30 Revised arguably offends a principle, it does so only in order to maintain constitutional deviations, accommodate the explosive growth in Johnson County in a fair manner, or serve the interests and foster the policies of other principles found in the guidelines Guideline. On balance, Buffalo 30 Revised is fundamentally fair to the people of Kansas when viewed in light of the policies expressed in the principles and Guidelines.

**a. Buffalo 30 Revised contains compact and contiguous districts**

Buffalo 30 Revised satisfies Guideline 4(b), which is one of the "traditional redistricting principles," in that it is as compact **as possible**. *See Joint Stipulation of Facts*, Ex. 9 (Doc. 171)(the Guidelines)(providing that "[d]istricts should be as compact **as possible** and contiguous")(emphasis added). A visual examination of the map, as well as compactness reports prepared by the KLRD, demonstrates that Buffalo 30 Revised contains districts that are sufficiently compact.[17] Additionally, the Owens Intervenors anticipate that evidence adduced at trial will further demonstrate that this Guideline has been satisfied.

Buffalo 30 Revised also satisfies Guideline 4(b)'s requirement that districts be contiguous. Generally, contiguity is considered to be one of the most uncontroversial rules for

[17] Posted on the Kansas Secretary of State's website are various reports related to compactness studies performed by the KLRD. *See, e.g.*, http://www.sos.ks.gov/elections/redistricting/Senate/M5_Buffalo%2030%20Revised/. These reports are part of the record pursuant to the parties *Joint Stipulation of Facts*, paras. (Doc. 171). On such report is designated "Measures of Compactness," and it provides the following summary compactness ("REOCK") scores for Buffalo 30 Revised: minimum, o.26; maximum, 0.60; mean, 0.44; and standard deviation, 0.09. *Id*. (44532 40-m5_buffalo30revised-compact.pdf).

drawing district lines. *See*, *e.g.*, *Shaw*, 509 U.S. at 647 (1993). A contiguous district general can be defined as one in which one can travel from one part of the district to any other part without crossing a district boundary. The district lines drawn in Buffalo 30 Revised are consistent with this principle.

**b. Buffalo 30 Revised attempts to preserve communities of interest**

Guideline 4(d) provides that districts should recognize similarities of interest (generally termed "communities of interest), and it requires that the drafters **attempt** to accommodate interests articulated by residents. *See Joint Stipulation of Facts*, Ex. 9 (Doc. 171). Buffalo 30 Revised adheres to this Guideline by preserving, to the extent possible, the communities of interest present in the current districting plan. One way it does this is by preserving the cores of existing senate districts. The core reports generated by the KLRD, which are available on the Kansas Secretary of State's website, [18] demonstrate that even though Buffalo 30 Revised collapses the 32nd district and moves it to Johnson County, on average, the 40 senatorial districts consist of 74% of the population from the existing districting plan.

Additionally, to the extent possible, Buffalo 30 Revised attempts to draw districts in a fashion that honors the urban/rural flavor of the State of Kansas. In this regard, where Buffalo 30 Revised alters the boundaries of an existing district, it generally attempts to avoid shifting a district from rural to urban or from urban to rural. Additionally, Buffalo 30 Revised does not split rural communities west of Highway 81 (*i.e.*, west of Salina). On the other hand, For the People 13b alters to districts, the 3rd and 19th, both of which are held by Democrats in ways that fundamentally transform their rural/urban flavor. The 19th District, for instance, loses a

---

[18] For example, please see the three core reports included in the directory available at http://www.sos.ks.gov/elections/redistricting/Senate/M5_Buffalo%2030%20Revised/.

significant inner city population center (East Topeka) and gains, in its place, rural Jefferson County.

**c. Buffalo 30 Revised respects political subdivisions. It splits subdivisions only where necessary to achieve constitutional deviations or serve another "traditional redistricting principle"**

Buffalo 30 Revised respects the integrity of political subdivisions, which is a requirement express in 4(c) of the Guidelines. It splits political subdivisions only where necessary to ensure that populations are apportioned within allowable constitutional deviations (*e.g.*, the subdivision is larger than an ideal sized district) or to serve another important public interest embodied in the "traditional districting principles."

**(1) Counties**

There are 105 counties in the State of Kansas. According to the KLRD's "Districts by County" report, Buffalo 30 Revised places 100% of the population of 86 counties in the same senatorial district, which equates to 81.904%% of the counties in the State Kansas being located in a single senatorial district.[19] According to the same report, Buffalo 30 Revised splits 19 counties,[20] which is less than the current plan's split of 22 counties.[21] And, Buffalo 30 Revised splits 12 of the same counties split by the current plan.[22]

---

[19] This number does not include Sumner County, which the KLRD "Districts by County" report shows as split geographically between the 33rd and 16th Districts, but which the report also shows as having 100.00% of its population in the 33rd District. Including Sumner County in the calculation, the number of counties with 100% of their population in a single district is 87, which equates to 82.857%% of the counties in the State Kansas being located in a single senatorial district.

[20] The 19 counties are as follows: Allen, Butler, Cherokee, Cowley, Dickinson, Douglas, Geary, Jefferson, Johnson, Leavenworth, Miami, Montgomery, Neosho, Osage, Riley, Sedgwick, Shawnee, Sumner, and Wyandotte.

[21] According to the KLRD's "District by County" report for the current plan, Sub. SB 256 splits 22 counties, but one of those splits, Morris County, involves a shift of no persons (i.e., 100.00% of the populations of Morris County is shown as being in the 17th District with 00.00% being in the 18th District). The 22 split counties (including Morris) are as follows: Anderson, Barton, Cherokee, Clark, Coffey, Dickinson, Douglas, Franklin, Greenwood, Haskell, Jewell, Johnson, Leavenworth, Marion, Miami, Montgomery, Morris, Osage, Riley, Sedgwick, Shawnee, and Wyandotte.

[22] The 12 counties are Cherokee, Dickinson, Douglas, Johnson, Leavenworth, Miami, Montgomery, Osage, Riley, Sedgwick, Shawnee, and Wyandotte.

However, of the 19 counties split by Buffalo 30 Revised, 6 had total populations greater than the ideal senatorial district size (plus 5%). As a result, these counties had to be split to achieve constitutionally sound deviations. Additionally, one of the splits did not shift any people to a new district (100.0% of the population of Sumner County is in the 33rd District, while 0.00% of the population is in the 16th District), and another of the splits shifted only 2 people to a new district (99.99% of the population of Neosho County is in the 14th District, while 00.01% is in the 13th District). Both of these splits resulted from drawing errors easily remedied by the Court, if it deems appropriate.

**(2) Cities**

Buffalo 30 Revised splits 19 cities. In Kansas, 6 cities have populations larger than the ideal sized senate district,[23] and, as a result, they must be split. Buffalo 30 Revised splits 13 more cities than the minimum, and some of these splits are due to annexation "islands" (e.g., a landfill or dump located outside the city proper). However, it splits fewer cities than For the People 13b, which splits 35.

**(3) Precincts (or voting districts "VTDs")**

Buffalo 30 Revised splits 135 precincts and leaves 3,772 precincts unsplit. However, 47 of the splits do not involve a change of population from one precinct to another. Thus, only 88 precincts are split in a manner that involves a change of population. These splits were the result of the drafters' attempt to draw districts in a way that, to the maximum extent possible, made them more easily identifiable by the voters in those districts. These splits were the result of an inherent conflict between two of the Guidelines for legislative redistricting: Guideline 4(c), pertaining to integrity of political subdivisions, and 4(f), requiring that districts be drawn so that

[23] The 6 cities are Kansas City, Lawrence, Olathe, Overland Park, Topeka, and Wichita.

they are easily identifiable and understandable by voters. *See Joint Stipulation of Facts,* para. 45 and Ex. 9 (the Guidelines)(Doc. 171).

The Owens Intervenors anticipate that evidence adduced at trial will demonstrate that the drafters' purpose in splitting precincts was to make each senatorial district more readily identifiable and understandable by voters in that district, which is the policy articulated in Guideline 4(f). Thus, where precincts were split, the reason was to "square off" borders by drawing them along natural boundaries, such as major highways, roads, rivers, *etc*., in order to make the district more recognizable to voters residing in that district

Occasionally, the drafters faced an inherent conflict between the instructions of Guideline 4(c), which provides that the integrity and priority of existing political subdivisions be preserved "**to the extent possible**," and 4(f), which provides that districts should be easily identifiable and understandable by voters. In an effort to achieve the legitimate goals of Guideline 4(f), 88 of 3,907 precincts were split in a manner that involved a change in population. Thus, where precincts were split in a way that affected population, the split had a legitimate purpose: *i.e*., to "square off" a district's borders by drawing them along natural boundaries, such as major highways, roads, rivers, *etc*., in order to make the district more recognizable to voters residing in that district

**(4) <u>Buffalo 30 Revised's treatment of political subdivisions compares favorably with the 2002 plan</u>**

On balance, Buffalo 30 Revised is more respectful of political subdivisions than was the senate redistricting plan that was adopted and approved in 2002. With respect to county splits, the 2002 plan split more counties (21) than does Buffalo 30 Revised (19), and one of the counties split by Buffalo 30 Revised affected no population. With respect to city splits, Buffalo 30 Revised split fewer cities (26) than For the People 13b (35).

Although Buffalo 30 Revised splits more precincts (135) than did the 2002 plan (38), 47 of the 135 splits affected no population. The remaining 88 splits are easily explained in terms of the drafters' efforts to resolve a conflict between the instructions in 4(c) and 4(f) the Guidelines. More particularly, in drawing the borders of the districts of Buffalo 30 Revised, the drafters intended to "square-off" their edges in order to further the explicit policy expressed in 4(f) of the Guidelines.

**d. Buffalo 30 Revised places only two incumbents in the same district**

One of the principles in the Guidelines, 4(e), provides that "[c]ontests between incumbent members of the Legislature or the State Board of Education will be avoided **whenever possible**." *Joint Stipulation of Facts*, Ex. 9 (emphasis added). Buffalo 30 Revised places only two of forty incumbents in the same district. They are placed in the same district, as a result of the collapse of the 32nd District to create a new senatorial district, the 32nd, for Johnson County. This is the only instance in which incumbents are placed in the same district. Thus, where possible, Buffalo 30 Revised adheres to Guideline 4(f).

The collapse will not jeopardize the competitive balance of the Senate. Currently, Republicans hold 32 of the State's 40 Senate seats. Democrats hold only 8 of the 40 seats. Republicans dominate the Senate by an overwhelming majority. By placing incumbents of the dominant party in the same district, Buffalo 30 Revised does not threaten to shift control of the Senate from the Republicans, nor does it threaten to push the Democrats farther into the minority. (On the other hand, at least one of the non-collapse plans, For the People 13b, redraws the 3rd and 19th Districts in a way that threatens 2 of the 8 incumbent Democrats, who, coincidentally, happen to be the Senate Minority Leader and the Democratic candidate for Governor in the last gubernatorial election).

The drafters of Buffalo 30 Revised had a legitimate reason to place these two incumbents in the same district. They recognized that the explosive growth in Johnson County required the creation of a new seat in Johnson County, and, based upon this growth, they determined that they should create a new seat for the new residents of Johnson County by collapsing a district in a region of the State with a lower rate of population growth or a decrease in total population. In order to avoid collapsing a district in an area of the State that was affected by the 1992 and 2002 collapses, they looked to the South Central region.

Additionally, Buffalo 30 Revised appears to follow Kansas legislative precedent. The Owens Intervenors anticipate that evidence adduced at trial will demonstrate that both the 1992 and 2002 senatorial redistricting plans collapsed a district to accommodate growth in Johnson County. Buffalo 30 Revised places the same number of incumbents in the same district, as did the senatorial redistricting plans that were approved in 1992 and 2002.

Despite the obvious legitimate reasons to collapse a district, and despite the precedent set by the collapses in 1992 and 2002, it appears that some intervenors, or some groups of intervenors may assert the interest of an incumbent to a particular district or a particular redistricting plan. A legislative body may consider political consequences and the interests of incumbent members when drawing districts. *See White*, 412 U.S. at 797; *Burns v. Richa*rdson, 384 U.S. 73, 89 n.16, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *cf. Gaffney v. Cummings*, 412 U.S. at 753 (writing that "politics and political considerations are inseparable from districting and apportionment…. The reality is that districting inevitably has and is intended to have substantial political consequences"). However, when the court must select or craft a redistricting plan, politics or political considerations have no play. *See William v. Jeffersonville City Council*, 2003 U.S.Dist. LEXIS 4590, **23-24 (S.D.Ind. Feb. 19, 2003)(writing that the interests of incumbent

members are the type of political consideration that is inappropriate for a court when selecting or crafting a redistricting plan).

**6. Buffalo 30 Revised does not have the purpose or effect of diluting minority voting strength**

Buffalo 30 Revised has neither the purpose nor effect of diluting minority voting strength. The Owens Intervenors anticipate that evidence adduced at trial will demonstrate that Buffalo 30 Revised does not dilute minority voting strength.

**D. The Court Should Adopt Cottonwood I as the Kansas State House of Representatives Plan**

Cottonwood I passed the Kansas Senate and the House of Representatives. It is the only state representative districting plan to have been passed by constitutional majorities of both the Senate and the House of Representatives. It was analyzed and vetted by the non-partisan KLRD's staff, its deviations from the ideal district size are within the constitutional standards,[24] it was considered by the Senate in light of the traditional redistricting principles described in the Guidelines, and it was passed by the Senate in deference to the Kansas Legislature's long-standing and unbroken tradition of deference to the other body's own map. Accordingly, the Owens Intervenors believe that the Court should adopt Cottonwood I as its state representative map.

**E. The Court Should Adopt Buffalo 30 Revised SBOE as the Kansas Board of Education Plan**

At this point, although still unclear, it seems that the only two board of education plans that will be submitted for the Court's review are those based upon the senate maps in Buffalo 30

---

[24] The ideal state representative district has 22,716 persons. According to analysis performed by the KLRD, Cottonwood I can be broken down into the following summary statistics: (1) it has a district population range with a low of 21,559 persons and a high of 23,838 persons; (2) it has an absolute district population range of 1,117 persons less than ideal of 22,716 persons up to 1,122 persons more than the ideal; (3) it has a relative district population range of -4.92% of the ideal up to 4.94% of the ideal; and (5) it has a relative overall range of 9.86%.

Revised and For the People 13b. Buffalo 30 Revised SBOE is superior because it expresses the will of the Senate (*i.e.*, it is the only plan to pass the Senate by a constitutional majority), it does not threaten the incumbency of the sole African American member of the board of education, it is within constitutional deviations, it has narrower deviations than the sole competing plan, and, when viewed in terms of "traditional redistricting principles," it serves basic notions of fundamental fairness.

### 1. **<u>The Court must base its map for the state board of education on its map for the state senate</u>**

Due to the manner in which the Kansas Constitution structures the state board of education, any map for the state board will be inextricably intertwined with the map the Court draws for the state senatorial districts. The Kansas Constitution provides that the State shall have ten members of the board of education. Kan. Const., Art. 6, Sec.3(a). It provides further that the Legislature shall make provision for ten member districts, each comprised of four contiguous senatorial districts. *Id*. In other words, under Kansas law, the state senatorial districts form the building blocks of the state board of education districts.

As required by the Kansas Constitution, the Court must draw its board of education map from the districts created in its state senatorial map. *See*, *e.g.*, *White*, 412 U.S. at 795 (acknowledging the rule that a federal district court, in the context of legislative reapportionment, "should follow the policies and preferences of the State, as expressed in…constitutional provisions…, whenever adherence to the state policy does not detract from the requirements of the Federal Constitution,….").

Thus, if the Court chooses Buffalo 30 Revised as its senate map, it must draw a map for the state board of education based upon the senate districts drawn in the Buffalo 30 Revised map, it cannot, for example, choose a board of education map based on one of the non-collapse plans

because they draw their 40 senate districts in different ways. As a practical matter, the Court's state senatorial map will heavily influence, if not determine, its state board of education map.

**2. <u>Buffalo 30 Revised SBOE is derived from the only senate redistricting plan to receive a constitutional majority in the Kansas Senate</u>**

Buffalo 30 Revised SBOE creates 10 school board districts, each of which is comprised of four contiguous senatorial districts, which, in turn, are as drawn in Buffalo 30 Revised. Buffalo 30 Revised SBOE was part of SB 2087, which the Senate passed by a vote of 21-17 on May 18, 2012. *See Joint Stipulation of Facts,* para. 87 (Doc. 171).

**3. <u>Buffalo 30 Revised SBOE is superior to For the People 13b-v1-SBOE because it does not gerrymander to the detriment of the sole African-American member of the Board of Education</u>**

The board of education map derived from Buffalo 30 Revised, designated Buffalo 30 Revised SBOE, is superior to the board of education maps drawn from For the People 13b, designated For the People 13b-v1-SBOE. In the history of the State of Kansas, only one African American has held a seat on the state school board. Ms. Carolyn L. Wims-Campbell, who currently is the member of the board of education for the 4th District, is the first and only African-American on the state board of education. For the People 13b-v1-SBOE redraws the 4th District in a way that likely jeopardizes the seat held by Ms. Wims-Campbell, but Buffalo 30 Revised SBOE does not.

In 2002, when the state board of education districts were last drawn, the ideal district size was 267,226. The 4th District had a population of 259, 928, which translates to a relative deviation of -2.73% from the ideal. It was, and is, comprised of the 2nd, 18th, 19th, and 20th senatorial districts. Its composition, by county, was as follows: Douglas County (26.66%), Osage County (5.03%), Shawnee (65.61%), and Wabaunsee (2.69%). It was designed to be a

predominantly urban district, with 122,415 of its constituent coming from Topeka and 62,325 from Lawrence.

The KLRD has not published on its website, nor has the Secretary of State published on his website, any statistical information for Buffalo 30 Revised SBOE or For the People 13b-v1-SBOE. Nevertheless, if one examines the maps posted on each site, it is clear that Buffalo 30 Revised SBOE attempts to maintain the urban flavor of the 4th District, whereas For the People 13b-v1-SBOE attempts to dilute it by stripping its urban core and drawing in more rural constituents.

Under Buffalo 30 Revised SBOE, the 4th board of education district is comprised of the 2nd, 18th, 19th, and 20th senatorial districts. Under Buffalo 30 Revised, the composition of the 2nd senatorial district is Douglas County (74.46%) and Jefferson County (25.24%); of the 18th senatorial district is Shawnee County (89.68%) and Wabaunsee County (10.32%); of the 19th senatorial district is Douglas County (7.49%), Jefferson County (2.15%), Osage County (21.37%), and Shawnee County (68.99%); and of the 20th senatorial district is Shawnee County (100%). In total, under Buffalo 30 Revised SBOE, the 4th board of education district includes 100% of Shawnee County and 58.82% of Douglas County. Thus, Buffalo 30 Revised SBOE attempts to preserve the urban core of the 4th board of education District, it does not radically transform the communities of interest represented by the 4th District, and, more importantly, it does not result in an effective racial gerrymandering of the board of education's sole African American member.

On the other hand, under For the People 13b-v1-SBOA, the 4th board of education district is comprised of the 2nd, 17th, 19th, and 20th senatorial districts. Under For the People 13b, the composition of the 2nd senatorial district is Douglas County (100%); the 17th senatorial district is

Chase County (3.84%), Dickinson County (3.82%), Lyon County (44.49), Marion County (17.14), Morris County (8.22%), and Osage County (22.49%); the 19th senatorial district is Douglas County (16.77%), Franklin County (0.00%), Jefferson County (26.71%), and Shawnee County (56.22%); and the 20th senatorial district is Shawnee (100.00%).

By removing the 18th senatorial district, and replacing it with the 17th senatorial district, For the People 13b-v1-SBOE substitutes largely rural population and small towns in the 17th senatorial district (with 22,376 in Emporia as the largest population center), for largely urban and inner city in the 18th senatorial district (with 44,028 in Topeka as the largest population center). The 17th senatorial district has 51,732 persons spread over a number of smaller towns, most with a population of a few hundred (22 with less than 750) or less (9 with less than 100). The largest population concentration, by far, is Emporia, with 23,767. The 18th senatorial district has 49,812 persons, largely concentrated in a single population center, Topeka, with 44,028.

Additionally, under For the People 13b-v1-SBOE, the 4th board of education is more fragmented, and more rural. It strips the 4th board of education district of its inner city urban core inn Topeka. And, an additional consequence of For the People 13b's redrawing of Senate Minority Leader Hensley's district, the 19th, to strip it of its inner city urban core, and replace it with more rural interests in Jefferson County, is that it also strips the 4th board of education district of its urban core.

### 4. <u>Buffalo 30 Revised SBOE is within the allowable constitutional deviations</u>

The KLRD did not do a statistical analysis of the deviations in Buffalo 30 Revised SBOE and For the People 13b-v1-SBOE. However, if one performs the analysis based upon the adjusted population data prepared by the KLRD, and presented in its Summary Population

Reports for the senate plans in Buffalo 30 Revised and For the People 13b, it is clear that Buffalo 30 Revised has narrower deviations than For the People 13b SBOE.

The ideal population for a state board of education district is 283,944. *See Joint Stipulation of Facts*, para. 39 (Doc. 171). Under Buffalo 30 Revised SBOE, the 1st District has an adjusted population of 279,972, the 2nd District has an adjusted population of 281,616, the 3rd District has an adjusted population of 279,770, the 4th District has an adjusted population of 277, 685, the 5th District has an adjusted population of 280,114, the 6th District has an adjusted population of 278,413, the 7th District has an adjusted population of 291,049, the 8th District has an adjusted population of 291,928, the 9th District has an adjusted population of 290,081, and the 10th District has an adjusted population of 289,117.

Based on these population figures, Buffalo 30 Revised SBOE can be broken down into the following summary statistics: (1) it has a district population range with a low of 277,685 persons and a high of 291,928 persons (both within the constitutional standard); (2) it has an absolute district population range of 6,259 persons less than ideal of 283,944 persons up to 7,984 persons more than the ideal; (3) it has a relative district population range of –2.20% of the ideal up to 2.81% of the ideal (both within the constitutional range of plus or minus 5% of the ideal population size);[25] and (4) it has a relative overall range of 5.01% (easily within the constitutional range of 10.0%).[26]

When the current state board of education plan was approved in 2002, known as SB 663, the ideal state board district population size was 267,226. The KLRD vetted the current plan in

---

[25] The calculation of relative deviations is performed as follows: absolute deviation divided by ideal population, where absolute deviation is calculated by district population minus ideal population. *See Redistricting Law 2010* (National Conference of State Legislatures), p,. 25 (Table 2. Statistical Terminology for Redistricting).

[26] The calculation of the relative overall range is the sum of the largest positive deviation and the largest negative deviation (ignoring the "+" or "-" signs). *See Redistricting Law 2010* (National Conference of State Legislatures), p,. 25 (Table 2. Statistical Terminology for Redistricting).

2002, and it determined the plan had the following deviations: (1) a district population range with a low of 257,955 persons and a high of 277,095 persons; (2) it had an absolute district population range of 9,271 persons less than ideal of 267,226 persons up to 9,869 persons more than the ideal (which equates to an absolute overall range of 19,140 persons); (3) it had a relative district population range of -3.47% of the ideal up to 3.69% of the ideal; and (5) it had a relative overall range of 7.16%.

Under For the People 13b-v1-SBOE, the 1st District has an adjusted population of 289,835, the 2nd District has an adjusted population of 290,806, the 3rd District has an adjusted population of 286,490, the 4th District has an adjusted population of 290,032, the 5th District has an adjusted population of 281,314, the 6th District has an adjusted population of 281,430, the 7th District has an adjusted population of 281,148, the 8th District has an adjusted population of 282,035, the 9th District has an adjusted population of 275,301, and the 10th District has an adjusted population of 281,054.

Based on these population figures, For the People 13b-v1-SBOE can be broken down into the following summary statistics: (1) it has a district population range with a low of 275,301 persons and a high of 290,806 persons; (2) it has an absolute district population range of 8,693 persons less than ideal of 283,944 persons up to 6,862 persons more than the ideal (which is larger than Buffalo 30 Revised SBOE); (3) it has a relative district population range of –3.06% of the ideal up to 2.43% of the ideal; and (4) it has a relative overall range of 5.01% (which is larger than Buffalo 30 Revised SBOE).

**F. The Competing Congressional Plans Are Inferior to Sunflower 9C or Sunflower 13**

In order to avoid duplication, the Owens Intervenors incorporate by reference the analysis of competing congressional plans submitted by the Davis Intervenors. With respect to the

congressional map, and with the exception of the Owens Intervenors' preference for Sunflower 9C, the Owens Intervenors' interests are aligned with those of the Davis Intervenors.

### G. The State Senate Plan Based upon For the People 13b_Is Inferior to Buffalo 30 Revised

When examined under the constitutional standards for deviations from the ideal, and when viewed with an eye toward basic notions of fundamental fairness, For the People 13b is inferior to Buffalo 30 Revised. Unlike Buffalo 30 Revised, the Senate never passed For the People 13b by a constitutional majority. Furthermore, For the People 13b does not create a new senate seat to accommodate the growth in Johnson County; instead, it shifts existing districts to absorb more of the increased population of Johnson County. Finally, For the People 13b has wider deviations than Buffalo 30 Revised, and it adheres less faithfully to the "traditional districting principles" commonly applied by federal courts asked to redraw redistricting plans as a result of state legislative inaction.

#### 1. For the People 13b never passed the Kansas Senate with a constitutional majority

For the People 13b never passed the Senate with a constitutional majority of 21 votes. *See Joint Stipulation of Facts*, paras. 74-87 (Doc. 171). In one form or another, For the People 13b was rejected by the Senate on more than one occasion. *See id.*, paras. 78 and 83. In contrast to For the People 13b, Buffalo 30 Revised passed the Senate after receiving a hearing in the Senate Committee on Reapportionment, and it also received bipartisan support in passing the Senate. *See id*., para. 87.

#### 2. For the People 13b has wider deviations than Buffalo 30 Revised

The KLRD analyzed For the People 13b. As a result of that analysis, it generated a number of reports, including a Population Summary report. Included with the Population

Summary report are the following conclusions: For the People 13b has (1) a district population range with a low of 67,877 persons and a high of 73,134 persons; (2) an absolute district population range of 3,109 persons less than ideal of 70,986 persons up to 2,148 persons more than the ideal (which equates to an absolute overall range of 5,257 persons, which is greater than the absolute overall range for Buffalo 30 Revised, 4,356 persons); (3) a relative district population range of -4.38% of the ideal up to 3.03% of the ideal; and (4) a relative overall range of 7.41% (which is greater than the relative overall range of Buffalo 30 Revised, 6.14%).

Additionally, as a result of not collapsing a district to address the increased population in Johnson County, For the People 13b results in Johnson County being populated with "heavy" districts that are almost certain to breach constitutional thresholds before 2022. Buffalo 30 Revised, however, adds a district to Johnson County, which allows it to populate Johnson County with "light" districts that can absorb some of the continued increase in population over the coming years.

### 3. **The House of Representatives refused to create a new senate district for Johnson County, even though it created three new representative districts for Johnson County in Cottonwood I**

As discussed above, even though Johnson County grew by 93,093 people,[27] the House of Representatives chose not to create a new senate district for Johnson County. However, the redistricting plan the House of Representatives proposed for itself creates three new representative districts in Johnson County. This approach is incongruous with its refusal to create a new senate district. The interests of over 93,000 new residents of Johnson County in full and fair representation in the senate surely trumps the interest of an incumbent Republican senator to avoid being placed in the 16th senatorial district with another incumbent Republican senator.

[27] The KLRD website has a map, entitled "Kansas Counties with Percent Population Change 2000 to 2010." It shows that Johnson grew by 93,093 persons, which translates to a change of 20.64%. See http://redistricting.ks.gov/_Census/census_ks_misc.html (tab entitled "Kansas Population Change").

**4. When viewed in terms of "traditional redistricting principles," For the People 13b does not serve basic notions of fundamental fairness**

When viewed in the light of fairness, Buffalo 30 Revised plainly is superior to For the People 13b. Buffalo 30 Revised attempts to mitigate the effects of the continued growth in Johnson County by creating a new senatorial district. It creates the new district by collapsing a district in a slower growing part of the State. Its approach is consistent with the precedent set by the Kansas Legislature during the 1992 redistricting process, and continued during the 2002 process. Furthermore, its approach does not place the burden, once again, on the areas of the State who sacrificed a seat in 1992 and 2002, and it does not collapse a district held by a member of the minority party, which currently holds only 8 of 40 seats.

On the other hand, For the People 13b protects all 40 incumbent senators at the expense of accommodating the continued growth of Johnson County. In order to avoid collapsing a district held by a Republican incumbent, it attempts to address the continued growth in Johnson County by shifting the borders of existing districts. One such shift involves moving the borders of the 3rd District, currently held by Tom Holland, a Democrat, and resident of Douglas County, well past the Douglas County line so that a narrow branch reaches out from Douglas County past DeSoto and into Johnson County. Another such shift involves moving the borders of the 19th District in a manner that leaves another Democrat, Minority Leader Anthony Hensley, with fewer urban voters in his home county and more rural voters in a county he's never represented before.

The manner in which For the People 13b manipulates the 3rd and 19th Districts implicates many of the Guidelines the House and Senate adopted to guide their efforts. For instance, (1) it does not preserve political subdivisions; (2) it creates oddly shaped districts (*e.g.*, pulling a narrow strip from the 3rd District's Douglas County border past DeSoto and into Olathe); (3) it

shifts the 3rd District deep into Johnson County and leaves the incumbent, Democrat Rep. Holland, with many new constituents in a county he has not represented and of which he is not a resident; (4) it strips the 19th District of its urban core and leaves the incumbent, Minority Leader Anthony Hensley, with many new constituents in a county of which he is not a resident; (5) it mixes communities of interest (*e.g.*, the 19th District is shifted from more urban to more rural), and it splits sizable cities that Buffalo 30 Revised does not (*e.g.*, Sabetha (in Brown and Nemaha Counties), DeSoto (in Johnson County), Spring Hill (in Miami and Johnson Counties), Newton (Harvey County), and Derby (in Sedgwick County); and (6) it produces districts that are less easily identifiable and understandable by voters.

For the People 13b does not address the continued growth in Johnson County. By failing to alleviate this problem by collapsing a district in a region where population is decreasing, or at least growing more slowly, For the People 13b guarantees that the State's population trends will result in the continued underrepresentation of voters in Johnson County, a problem which will only worsen over the next decade. For the People 13b simply reflects a choice to protect a single incumbent Republican senator in the 32nd District at the expense of the interests of a sizable number of Kansas voters in Johnson County.

In short, when viewed in light of the "traditional redistricting principles," and when balanced against the apparent population trends, it is clear that For the People 13b not only is fundamentally unfair to the voters in 2012, but it will result in continued underrepresentation of a large and growing portion of the State and it will sow the seeds for yet another redistricting crisis in 2022.

### H. <u>**The State Senatorial Plan Based Upon Wheat State 5 is Inferior to Buffalo 30 Revised**</u>

Wheat State 5 is nearly identical to For the People 13b. It is inferior to Buffalo 30 Revised for many, if not all, of the same reasons as For the People 13b. When examined under the constitutional standards for deviations from the ideal, and when viewed with an eye toward basic notions of fundamental fairness, Wheat State 5 is inferior to Buffalo 30 Revised. It has wider deviations, and it adheres less faithfully to the "traditional districting principles" commonly applied by federal courts asked to redraw redistricting plans as a result of state legislative inaction. Furthermore, unlike Buffalo 30 Revised, the Senate never passed Wheat State 5 by a constitutional majority.

#### 1. <u>**Wheat State 5 never passed the Kansas Senate with a constitutional majority**</u>

Wheat State 5, unlike Buffalo 30 Revised, never passed the Senate with a constitutional majority of 21 votes. *See Joint Stipulation of Facts*, paras. 74-87. In one form or another, the Wheat State series of maps failed in the Senate. *See id*., para. 82. And, in fact, Wheat State 5 never even passed the House of Representatives with a constitutional majority, failing even to receive enough voice votes to go to a roll call vote in the House. *See id*., para. 85.

#### 2. <u>**Wheat State 5 has wider deviations than Buffalo 30 Revised**</u>

The Summary Population Report that is attached to the map of Wheat State 5 published on the KLRD's website appears to be based on an incorrect number for the ideal senatorial district size. The ideal size is calculated by dividing the adjusted state population by the number of senate districts (2,839,445/40), and it is 70,986 persons. The population summaries published by the KLRD for Buffalo 30 Revised and For the People 13b correctly show the ideal district size to be 70,986, and, consequently, the statistical analysis in those two summaries are not

skewed by reference to an incorrect number for the ideal district size. However, the summary population report for Wheat State 5 incorrectly calculates the ideal size to be 71,328, as a result, the statistical calculations based on that incorrect figure also are incorrect.[28]

Nevertheless, if one examines the tabular data by district and adjusted population, and if one performs the necessary calculations using the correct ideal district size, the statistical deviations for Wheat State 5 are as follows: (1) a district population range with a low of 67,877 persons and a high of 73,134 persons; (2) it had an absolute district population range of 3,109 persons less than the ideal district size of 70,986 persons up to 2,148 persons more than the ideal (which equates to an absolute overall range of 5,257 persons, which is larger than the absolute range for Buffalo 30 Revised); (3) it had a relative district population range of -04.379% of the ideal up to 03.279% of the ideal;[29] and (5) it had a relative overall range of 7.658%. (which is greater than the relative overall range for Buffalo 30 Revised).[30]

**3. <u>When viewed in terms of "traditional redistricting principles," Wheat State 5 does not serve basic notions of fundamental fairness</u>**

Just like For the People 13b, Wheat State 5 attempts to address the growth in Johnson County by shifting the borders of existing districts. The population numbers and deviations for the 7 Johnson County senate districts is the same for Wheat State 5 and For the People 13b. Both draw heavy districts in order to avoid a single Republican incumbent being placed in the same district as a fellow Republican.

---

[28] The pertinent affected calculations are the absolute range around the ideal (expressed in terms of number of persons above or below the ideal), percentage deviation from the ideal (expressed as the relative district population range) and the total deviation around the ideal (expressed as the relative overall range).

[29] The calculation of relative deviations is performed as follows: absolute deviation divided by ideal population, where absolute deviation is calculated by district population minus ideal population. *See Redistricting Law 2010* (National Conference of State Legislatures), p,. 25 (Table 2. Statistical Terminology for Redistricting). For Wheat State 5, the relative deviation calculation is as follows: (1) 67,877-70,986= -3,109; -3,109/70,986=.04379 (or -04.379%) and (2) 73,314-70986=2,328; 2,328/70,986=.03279% (or 03.279%).

[30] The calculation of the relative overall range is the sum of the largest positive deviation and the largest negative deviation (ignoring the "+" or "-" signs). *See Redistricting Law 2010* (National Conference of State Legislatures), p,. 25 (Table 2. Statistical Terminology for Redistricting).

### I. The State Representative Plans Based Upon Cottonwood II Are Inferior

Cottonwood I passed both the Senate and the House of Representatives by a constitutional majority. *See Joint Stipulation of Facts*, paras. 76 and 81 (Doc. 171). On the other hand, Cottonwood 2 passed the House of Representatives, *see id.*, para. 79, but not the Senate, *see id.*, para. 80. And, Cottonwood II has no advantage over Cottonwood I with respect to deviations, as the KLRD's statistics show that the two plans have the exact same deviations. More specifically, they both have a district population range with a low of 21,599 and high of 23,838, they both have an absolute district population range of 1,117 persons less than the ideal district size of 22,716 up to 1,122 persons more than the ideal, they both have a relative district population range of -04.92% of the ideal up to 04.94% of the ideal, and they both had an absolute population range of 9.86%.[31]

### J. The State Board of Education Plan Based Upon For the People 13b-v1-SBOE is Inferior

When examined under the constitutional standards for deviations from the ideal, and when viewed with an eye toward basic notions of fundamental fairness, For the People 13b-v1-SBOE is inferior to Buffalo 30 Revised. It has wider deviations, it gerrymanders the 4th District in a way that jeopardizes the sole African-American member of the state board of education (who, in fact, is the only African American member of the state board of education in the history of the State of Kansas), and it adheres less faithfully to the "traditional districting principles" commonly applied by federal courts asked to redraw redistricting plans as a result of state legislative inaction.

---

[31] The statistical data for Cottonwood I and Cottonwood II are available on the websites maintained by the KLRD. The Population Summary Report for Cottonwood I is at http://redistricting.ks.gov/_Plans/Proposed_Plans/m5_cottonwood1/30-m5_cottonwood1-popsum.pdf. The Population Summary Report for Cottonwood II is at http://redistricting.ks.gov/_Plans/Proposed_Plans/m5_cottonwood%20II/30-m5_cottonwoodii-popsum.pdf

## CONCLUSION

For each of the reasons set forth in this memorandum, the Owens Intervenors ask that the court redraw the State's congressional and state redistricting maps to conform to, or adhere as closely as practicable to, the maps the Kansas Senate designated as follows: (1) Sunflower 9C (congressional); (2) Buffalo 30 Revised (state senatorial); (3) Cottonwood I (state representative); and (4) Buffalo 30 Revised SBOE (state board of education).

Dated: May 29, 2012

Respectfully submitted,

s/ *John C. Frieden*

John C. Frieden #06592
Kevin M. Fowler #11227
Clinton E. Patty #18912
Eric I. Unrein #16042
FRIEDEN, UNREIN & FORBES, LLP
555 S. Kansas Avenue, Suite 303
Topeka, KS 66603
785-354-1100 Phone
785-354-1113 Fax
jfrieden@fuflaw.com
kfowler@fuflaw.com
cpatty@fuflaw.com
eunrein@fuflaw.com

Pedro L. Irigonegaray #8079
Irigonegaray & Associates
1535 SW 29th Street
Topeka, Kansas 66611-1901
785-267-6115 Phone
785-267-9548 Fax
pli@plilaw.com

**ATTORNEYS FOR INTERVENOR-PLAINTIFFS SENATOR THOMAS C. OWENS, JOHN E. HENDERSON, BERNIE SHANER, AND RON WIMMER**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of May, 2012, I electronically filed the foregoing Complaint in Intervention with the Clerk of the Court using the CM/ECF system, which will automatically send a notice of electronic filing to all interested parties of record.

s/ *John C. Frieden*
John C. Frieden #06592